IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re<br><br>JON TROY ALTER,<br><br>  Debtor. | Chapter 7<br><br>Case No. 05-06547-PHX-SSC<br><br>Adversary No. 05-579 |
| JERRY & BETTY MAE KELLY,<br><br>  Plaintiff,<br>v.<br><br>JON TROY ALTER,<br><br>  Defendant. | MEMORANDUM DECISION<br><br>(Opinion to Post) |

## I. **PRELIMINARY STATEMENT**

Plaintiffs, Jerry and Betty Mae Kelly, commenced an adversary proceeding against Jon Troy Alter, the Debtor herein, on August 1, 2005, to determine whether a debt due and owing to them is nondischargeable under 11 U.S.C. §523(a)(2)(A). The Defendant filed an Answer on August 16, 2005. The Court held a trial on April 5, 2006 and June 14, 2006. At the conclusion of the trial, the Court took this matter under advisement. This Decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, Bankruptcy Rule 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§1334 and 157 (West 2006).

## II. FACTUAL DISCUSSION

In March 2001, prior to the Debtor seeking relief from this Court, he purchased property known as the Dagger Ranch ("Ranch") from Herb Fletcher ("Fletcher") for $625,000. The purchase price was paid with the following funds: $25,000 from the Debtor; $100,000 from the Plaintiffs; $150,000 from the Debtor's father; $50,000 from Bill Yokobosky, Debtor's friend; with Fletcher providing purchase money financing to the Debtor in the amount of $300,000. Fletcher obtained a first lien on the Ranch securing his obligation, but none of the other individuals who provided financing obtained a lien. Both the Debtor and the Plaintiffs testified that at the time of the purchase, the Debtor advised the Plaintiffs that Fletcher would not permit any other liens to be placed on the Ranch. The Debtor stated that any such encumbrance would create a default under Fletcher's loan documentation. The obligations incurred at the time of the purchase of the Ranch and owed by the Debtor to Bill Yokobosky and the Debtor's father, although general unsecured obligations, have been repaid by the Debtor.

In March 2001, the Debtor also structured an agreement with Jerry Kelly and Betty Mae Kelly, his mother, which allowed the Plaintiffs to live at the Ranch, rent-free, for the remainder of their lives, and for the Debtor to employ Mr. Kelly in the Debtors' construction business, providing Mr. Kelly with a salary. Mr. Kelly left his job in Nevada, and he and Betty Mae sold their home in California to move to the Ranch. The Debtor, pursuant to the agreement of the parties, employed Mr. Kelly, commencing in July 2001. The Debtor testified that he paid Mr. Kelly $1,200 a week for approximately a year and a half.[1] This testimony was not effectively controverted by the Plaintiffs. Eventually it became clear that Mr. Kelly was no longer able to work on the Debtor's construction projects.[2] From

---

**1** This would amount to approximately $98,400.

**2** The parties disputed the reason for Mr. Kelly's failure to work for the Debtor. For purposes of this Decision, the ultimate reason for Mr. Kelly's leaving the Debtor's employ is irrelevant.

2

the Court's review of the photographs of the Ranch at the time that the Plaintiffs left the premises, it is clear that the Ranch needed numerous improvements to make it habitable, but that little work was done by Mr. Kelly to make it so. The Ranch remained in disrepair while the Plaintiffs resided thereon.[3]

On July 21, 2002, the Debtor executed a demand Promissory Note in favor of the Plaintiffs.[4] The Note was signed to memorialize the money advanced by the Plaintiffs to the Debtor for the purchase of the Ranch. At the time of the execution of the Note, the Debtor again informed the Plaintiffs that he could not provide to them a lien on the Ranch, because it might cause a default under the loan documentation held by the first lienholder, Fletcher. The Court concludes that this testimony is consistent with the other evidence presented during the trial. For instance, the Debtor did not execute a note in favor of his father, who also assisted in the purchase of the Ranch. Even though he did execute a note in favor of his friend, Bill Yokobosky, the Debtor provided no lien or encumbrance to his friend. Yokobosky confirmed the Debtor's testimony on this point, and he also testified that he had engaged in numerous business transactions with the Debtor in the past, and that it was not unusual for the Debtor to execute a promissory note, with no deed of trust as security therefor.

In December 2002, the Debtor stopped paying Mr. Kelly's salary. Shortly thereafter, the Debtor failed to make the next installment payment due on the Note, and in January 2003 the Plaintiffs moved off the Ranch.[5] Subsequently, on March 31, 2003, the Plaintiffs made a written demand for payment under the terms of the Note.[6] In their letter, the Plaintiffs threatened to commence an action against the Debtor, within 30 days of their demand, if the Debtor did not pay the Note in full.

---

[3] *See* Exhibit 9. Photos show homes and property in a state of extreme disrepair.

[4] *See* Exhibit 1.

[5] The Debtor paid a total of $6,900 on the Promissory Note.

[6] *See* Exhibit 10.

3

On April 17, 2003, the Debtor recorded a deed of trust in the amount of $474,000 against the Ranch in favor of Sharlene Alter.[7] Sharlene Alter is the Debtor's ex-wife and current live-in girlfriend. The Deed of Trust was allegedly given to secure a $474,000 Note.[8] Pursuant to the Debtor's testimony, Ms. Alter had provided the Debtor with financial assistance on various construction projects over the years, resulting in the $474,000 debt obligation. Both the Debtor and Ms. Alter failed to produce any documents concerning the circumstances surrounding the incurrence of such an overwhelming obligation and the recording of the Deed of Trust. Other than the conclusory, self-serving testimony provided by Ms. Alter, no evidence or exhibits were produced to substantiate the validity or the amount of the $474,000 debt obligation and the lien securing such obligation. Mr. Yokobosky did confirm that the Debtor contacted him around this time and asked whether Mr. Yokobosky would assist the Debtor with some type of immediate financing to "take out" the first lienholder, Fletcher, if the latter party determined that the placing of an encumbrance on the Ranch was a default under Fletcher's loan documents. Mr. Yokobosky testified that other than those preliminary communications, nothing further happened, and he was unsure, if there had been a problem., how it was resolved.

In August 2003, the Plaintiffs commenced a State Court action against the Debtor.[9] The Plaintiffs and the Debtor entered into stipulated judgment in the amount of $95,000, plus attorneys' fees, on July 22, 2004.[10] Interestingly enough, the Debtor did send the Plaintiffs a letter proposing a repayment of the obligation.[11] However, he did not offer a lien concerning the repayment of the obligation, and he did not disclose Yokobosky's offer to

---

**7** *See* Exhibit 3. The Deed of Trust has an execution date of April 10, 2003.

**8** *See* Exhibit 3. The Promissory Note also has an execution date of April 10, 2003.

**9** *See* Exhibit 5.

**10** *See* Exhibit 2.

**11** *See* Exhibit 11.

4

provide take-out financing if a default did occur under the first lien as a result of granting any subordinate liens or encumbrances on the Ranch. The Debtor also did not disclose that he had recently encumbered the Ranch with a lien in favor of Ms. Alter.

The Debtor filed a Chapter 7 bankruptcy petition on April 18, 2005. As an asset of the estate, the Ranch was sold by the Trustee in August 2005. Sharlene Alter received over $100,000 from the sales proceeds.[12]

## III. LEGAL DISCUSSION

Pursuant to 11 U.S.C. § 523(a)(2)(A), a monetary debt is nondischargeable "to the extent obtained by false pretenses, a false representation, or actual fraud." In the Ninth Circuit, to prove actual fraud in order to except a claim from discharge, a creditor must establish each of the following elements: (1) The debtor made the subject representations, or omitted to state material facts, equating to a misrepresentation(s); (2) At the time the subject representations or omissions were made, the debtor knew the representations were false, or knew that the omissions created a materially false statement(s), and the debtor was under a duty to disclose the omitted statement(s); (3) The debtor made the subject representations or omissions with the intention of deceiving the creditor; (4) The creditor justifiably relied upon the debtor's representations or omissions to state material facts; (5) The creditor suffered the alleged damages as the proximate result of the subject representations or omissions having been made. In re Harmon, 250 F.3d 1240, 1246 n. 4 (9th Cir.2001); In re Eashai, 87 F.3d 1082, 1086 (9th Cir.1996) *citing* In re Britton, 950 F.2d 602, 604 (9th Cir.1991); In re Rosendahl, 307 B.R. 199 (Bankr.D.Or. 2004). The Plaintiff must establish the nondischargeability of a debt by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654, 657-58, 112 L.Ed.2d 755 (1991).

The Plaintiffs bear the burden of proof, by a preponderance of the evidence, on all elements of a Section 523(a)(2)(a) request that certain debt be deemed

---

**12** *See* Exhibit 8.

5

nondischargeable. Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654, 657-58, 112 L.Ed.2d 755 (1991). The concealment or omission of material facts that a party has a duty to disclose can support the nondischargeability of a debt on the grounds of actual fraud. In re Apte, 96 F.3d 1319, 1323-(9th Cir.1996); In re Ekrem, 192 B.R. 982, 992 (Bankr.C.D.Cal.1996). A concealed fact is material if "a reasonable man would attach importance to the alleged omissions in determining his course of action." In re Miller, 310 B.R. 185 (Bankr.C.D.Cal.2004) *citing* In re Evans, 181 B.R. 508, 515 (Bankr.S.D.Cal.1995).

Here, the Debtor recorded a Deed of Trust in favor of his ex-wife and then live-in girl friend, Sharlene Alter, on April 17, 2003. The recordation of this Deed of Trust occurred shortly after the Debtor received a written demand for payment by the Plaintiffs, which also threatened legal action against the Debtor if the Debtor failed to pay the Plaintiffs' obligation in full within 30 days. As noted, the Debtor sent the Plaintiffs his own proposal for repayment of the Note, but he did not disclose in the letter that he had recently encumbered the Ranch.[13] The Debtor did not disclose to the Plaintiffs that one of his friends was prepared to provide financing to the Debtor to take out the first lien, if the Debtor did desire to place another lien on the Ranch. The Debtor knew this information was material to the Plaintiffs, as the Plaintiffs had repeatedly requested some form of security from the Debtor over the years to ensure repayment of the Debtor's obligation to them. Given the offer of Yokobosky, the Debtor's failure to disclose this financing, and the Debtor's concomitant granting of a lien to Ms. Alter constituted an actual intent to defraud the Plaintiffs. In essence, the Debtor was placing any hope of recovery of their obligation out of the reach of the Plaintiffs.

. For a debt to be excepted from discharge, the debtor must actually intend to defraud the creditor In re Tsurukawa, 258 B.R. 192 (9th Cir. BAP 2001). However, direct evidence of an intent to deceive is rarely shown. Hence, intent may be "inferred and established from the surrounding circumstances." In re Hultquist,101 B.R. 180 (9th Cir. BAP

---

[13] *See* Exhibit 11.

6

1989); In re Anastas, 94 F.3d 1280 (9th Cir. 1996); In re Dakota, 284 B.R. 711 (Bankr.N.D.Cal. 2002). Because no single objective factor is dispositive, assessment of intent is, thus left to the fact-finder. In re Jacks, 266 B.R. 728 (9th Cir. BAP 2001). The intent to defraud a creditor is a finding of fact. In re Rubin, 875 F.2d 755, 759 (9th Cir. 1989).

Of significant concern to the Court is the fact that neither the Debtor nor Ms. Alter produced any evidence or exhibits to substantiate the validity of a $474,000 debt obligation, the alleged basis for the Deed of Trust. Both testified that Ms. Alter had provided the Debtor with financial assistance on various projects, resulting in the debt obligation, and that the Deed of Trust was a way for Ms. Alter to protect her financial interests. Yet the parties were unable to provide bank statements evidencing any transfer of funds, copies of checks, or any other financial documentation that could give credence to their story. Both Ms. Alter's Deed of Trust and corresponding Note were executed on April 10, 2003, less than two weeks after the Plaintiffs' demand for payment in full. At the very least, the timing of the recordation of the Deed of Trust in favor of Sharlene Alter, soon after the Plaintiffs made a legal demand for payment, is an element of the Debtor's fraudulent conduct. Thus, the Court may infer that the Debtor was concerned about the Plaintiffs' placing a lien on the Ranch, since a demand for payment had been made by the Plaintiffs. He decided to protect his own financial interest by recording a lien in favor of his girlfriend and placing any equity in the Ranch beyond the reach of the Plaintiffs. Thus, the Court concludes that the failure to disclose the take-out financing that Yokobosky offered, the failure to provide the Plaintiffs with a lien or repay the Plaintiffs after they had made demand, coupled with the Debtor's transferring the equity in the Ranch to Ms. Alter by placing her Deed of Trust as a lien on the Ranch, were done with the intent to defraud the Plaintiffs as creditors. The Plaintiffs have show, by a preponderance of the evidence, Factors 1, 2, and 3 of the Ninth Circuit case law concerning fraud.

The Court also concludes that the Plaintiffs have established the fourth element, justifiable reliance. The Supreme Court has held that a creditor's reliance on a

7

Case 2:05-ap-00579-SSC    Doc 24    Filed 09/18/06    Entered 09/18/06 10:10:51    Desc
Main Document    Page 7 of 11

debtor's misrepresentation or omission need be only justifiable, not reasonable, to except a debt from discharge under § 523(a)(2)(A). Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 439, 133 L.Ed.2d 351 (1995).  Prior to the Supreme Court's decision in Field v. Mans, the Ninth Circuit repeatedly held that creditors must prove "justifiable reliance" in exception to discharge cases. In re Kirsh, 973 F.2d 1454, 1458-1460 (9th Cir.1992); In re Apte, 180 B.R. 223 (9th Cir. BAP 1995). In In re Apte,, the Bankruptcy Appellate Panel explained the meaning of justifiable reliance:

> The general rule is that a person may justifiably rely on a representation even if the falsity of the representation could have been ascertained upon investigation. In other words, negligence in failing to discover an intentional misrepresentation is no defense. However, a person cannot rely on a representation if he knows that it is false or its falsity is obvious to him. In sum, although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth.

Id. at 229 (internal citations and quotations omitted).

In considering whether the reliance is justifiable, the court must take into account "the knowledge and relationship of the parties." Id at 1458.  Here, the parties are related. The Debtor is Betty Mae's son, and Jerry Kelly's stepson. By all accounts the parties had a good familial relationship, with the Plaintiffs feeling comfortable providing the sum of $100,000, of their own funds, to assist in the purchase of the Ranch.  From the testimony of the parties, it appears that the parties all intended to reside eventually on the Ranch.  Based upon the Debtor's previous representations, the Plaintiffs were under the belief that the Debtor could not grant a lien on the Ranch without creating a default under the first lien held by Fletcher.  As a result, during the course of their dealings with the Debtor over the years, the Plaintiffs were only able to obtain a Promissory Note to document their $100,000 loan.  Even the Debtor's own testimony was that he could not provide any lien to any member of his family for fear of causing a default under the first lienholder's loan documents.  Moreover, as far as the Plaintiffs were aware, no lien had been provided to any family member or friend

8

who had assisted in the purchase of the Ranch.  Thus, it was justifiable for the Plaintiffs to rely on the Debtor's ongoing representations that he could not secure their Note with a lien on the Ranch.  When the Debtor then obtained Yokobosky's agreement to lend him money in case there was a default under the first lien, coupled with the Debtor's transferring the equity in the property to his girlfriend as a result of the Debtor's fraudulent conduct, the Plaintiffs had no reason to investigate or question the actions of the Debtor.  Moreover, the Debtor sent a letter to the Plaintiffs proposing to repay them at a time when the Debtor knew that he had already granted a lien to Ms. Alter and the first lienholder had not declared a default under his loan documents.  The Plaintiffs continued to believe justifiably that the Debtor had no ability to grant a lien on the Ranch.  The fourth factor of the test has been shown.

As to the fifth factor, the Debtor's failure to disclose and his transfer of equity to Ms. Alter were the proximate cause of the Plaintiffs' damages.  As noted previously, the Trustee sold the Ranch, but Ms. Alter received the sum of $100,000 from said sale.  The actions of the Debtor, his fraudulent conduct, caused the damages incurred by the Plaintiffs herein.  If the Debtor had granted the Plaintiffs a lien when requested, the Plaintiffs would have been repaid from the sale of the Ranch, not Ms. Alter.

However, there is yet another basis to enter judgment in favor of the Plaintiffs. The Plaintiffs were not repaid on their Note and eventually filed suit against the Debtor.  In their Complaint, the Plaintiffs asserted various causes of action, including a count for breach of contract and one for fraudulent transfer.  On July 22, 2004, the parties entered into a stipulated judgment in the amount of $95,000, plus attorneys' fees. The stipulated judgment also serves as basis for a nondischargeable judgment in bankruptcy court.

The United States Supreme Court in <u>Archer v. Warner</u>, 538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) held that a settlement or stipulated judgment reducing a previous claim for fraud into a monetary obligation without a specific finding of fraud can continue to be barred from discharge under 11 U.S.C. § 523. In <u>Archer</u>, the debtors sold a company to the creditors, and the creditors sued the debtors for fraud in connection with the

9

Case 2:05-ap-00579-SSC    Doc 24    Filed 09/18/06    Entered 09/18/06 10:10:51    Desc
Main Document    Page 9 of 11

sale. The parties settled the lawsuit.  However, when the debtors failed to make payments under the settlement agreement and filed for bankruptcy, the creditors asserted that the debt was nondischargeable under § 523(a)(2)(A). The issue was whether the settlement agreement was a novation of the original debt for money obtained by fraud, with the novation negating the fraud claim. The Supreme Court held that the entire settlement debt was nondischargeable under  § 523(a)(2)(A), even though the parties had executed a settlement agreement. As long as the creditor is able to prove that the debtor fraudulently took something of value, such as money, property, or services from the creditor, then any damages resulting from that fraud are nondischargeable under section 523(a)(2)(A).

In this case, the facts are similar to Archer.  The Debtor perpetuated a fraud upon the Plaintiffs by encumbering the Ranch with a lien in favor of Sharlene Alter, in an attempt to prevent the Plaintiffs from utilizing a lien on the Ranch to repay them on their Note.  Soon after the Plaintiffs commenced their action against the Debtor, which alleged fraud, the parties entered into a stipulated judgment, thereby resolving their dispute. After the Debtor filed his bankruptcy petition, the Plaintiffs commenced this action to deem their judgment to be  nondischargeable under § 523(a)(2)(A). The Plaintiffs have shown, during this trial, that facts underlying their judgment support a claim of fraudulent conduct by the Debtor.  The Debtor placed the equity in the Ranch beyond the reach of the Plaintiffs at a time when the Plaintiffs had demanded repayment of their Note.

Based upon the facts presented  and the holding in Archer, the Court concludes that the Plaintiffs have carried their burden of proof on all elements of their claim, and the debt is nondischargeable.

## IV. CONCLUSION

Based upon the foregoing, the Court concludes that the Plaintiffs have established all the elements of §523(a)(2)(A). The entire debt owed to the Plaintiffs is nondischargeable.

The Court will execute a separate order incorporating this Memorandum Decision.

DATED this 18th day of September, 2006.

_____

Honorable Sarah Sharer Curley
United States Bankruptcy Judge